Filed 7/8/15  In re N.S. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re N.S. et al., Persons Coming Under the Juvenile Court Law. | B257350 (Los Angeles County Super. Ct. No. CK88763) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>KEVIN S.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Teresa Sullivan, Judge.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**SUMMARY**

Kevin S. (Father) appeals from the juvenile court's jurisdictional order of February 27, 2014, declaring his daughters, N.S. and A.S., dependents of the court under Welfare and Institutions Code[1] section 300, subdivision (b).

On appeal, Father contends that substantial evidence did not support sustaining the petition against him. We disagree and affirm.

**STATEMENT OF FACTS AND PROCEDURE**

On October 23, 2013, the Los Angeles Department of Children and Family Services (DCFS) filed a section 300 petition (Petition) on behalf of N.S. (then five years old) and A.S. (then three years old), alleging inter alia that N.S. and A.S. had suffered, or there was substantial risk that they would suffer, serious physical harm or illness due to the failure of their mother, R.W. (Mother), to comply with a juvenile court order in a prior dependency proceeding which restricted Father to monitored visits and for Mother not to be the monitor. Rather, the Petition alleged, Mother allowed Father to reside in the children's home and to have unmonitored visits with the children. The children were not detained from parents.[2]

Also on October 23, 2013, DCFS filed a Non-Detained Report stating that in a prior 2011 dependency case, a sustained allegation stated that Mother and Father had a history of violent altercations in the presence of the children and described several instances where Father struck or choked Mother. As part of the prior case, Father was ordered to complete a parenting program and either domestic violence program or individual counseling to address domestic violence but Father never provided documentation that he had done so. Jurisdiction in the prior case was terminated on January 31, 2013, and the family law order ordered joint legal custody, physical custody

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Four other counts in the Petition were later dismissed.

and primary residence with Mother, and monitored visits for Father to be monitored by "Alexis []"[3] or any other mutually agreed upon monitor.[4]

In the present case, DCFS received a referral on August 26, 2013, from an anonymous caller reporting that Father and Mother "had been back together for about a year and the domestic violence is starting to escalate again." Specifically, the caller indicated that on the day of the call Father slapped Mother across the face in front of the children and 10 days earlier Father started "socking" Mother in the nose while in the car in front of their residence.

When the DCFS social worker went to a Lancaster address listed in the referral, maternal grandmother (MGM) stated that Mother and Father did not live at the address. The social worker spoke to Father and Father stated that he and Mother were not living together, gave an address on Figueroa Street in Los Angeles for himself and stated Mother lived in Lancaster, although he did not know her address. Although Father initially agreed to meet with the social worker at Father's Figueroa residence, Father missed the appointment and did not provide a new time to meet.

The Non-Detained Report further detailed DCFS's contact from Brianna B., Father's ex-girlfriend and mother to his two other children. According to Brianna, Father had taken Bryson, one of Father's children with Brianna, and refused to give him back. A California City police report indicated that on August 21, 2013, Mother attempted to get Bryson back but Father took him from her arms and put him in Father's car and drove off, leaving A.S. standing outside the car. Brianna took A.S. with her and eventually to the California City police station but in the meantime Father had reported Brianna for child abduction at a sheriff's station and Brianna was arrested.

The sheriff's incident report filed based on Father's report of A.S.'s abduction listed Mother and A.S. as having the same Manhattan Place address and apartment number in Los Angeles as Father. When the social worker went to the Manhattan Place

---

[3] Alexis is a paternal aunt.

[4] The Non-Detained Report also indicated that there were four other prior referrals against parents which were deemed unfounded or inconclusive.

3

address, a man who looked like Father answered the door but claimed the social worker had the wrong address. The social worker spoke to the apartment manager at Manhattan Place who confirmed Father lived in the apartment with his two children and a woman he believed to be Mother.

According to the Non-Detained Report, the DCFS social worker contacted all school districts within Antelope Valley and was advised that no child by N.S.'s name was enrolled in any of the schools. The social worker contacted the Los Angeles elementary school N.S. would be zoned for based on Father's Manhattan Place address and discovered that N.S. had been withdrawn from the school a few days earlier.

DCFS obtained an investigative search warrant for the Manhattan Place address. When DCFS and police went to the house on the morning of October 7, 2013, Mother, Father, N.S. and A.S. were all in the apartment. Mother stated she lived in Lancaster with MGM and that N.S. went to school in Lancaster at Nancy Cory, but after being asked why N.S. was enrolled at Los Angeles Elementary School and listed her address as Father's Manhattan Place address, Mother stated after a pause that N.S. "was going to school here but will be going to Nancy Cory" in Lancaster. Mother explained she monitored Father's visits because she could not get a monitor. Mother denied any current domestic violence. According to the report, A.S. was still sleeping but the social worker spoke to N.S. N.S. claimed she had never seen any arguments or domestic violence between Mother and Father. When asked if there was any current domestic violence between himself and Mother, Father told the social worker to figure it out himself. Father also asserted the court had no authority to stop him from being with his children nor could the court's order prevent him from living with his children.

Neither Mother nor Father attended the initial detention hearing on October 23, 2013, and the matter was continued to the next day. On October 24, 2013, DCFS filed a Last Minute Information to the Court indicating that Los Angeles Elementary recently received a call from Mother asking about re-enrolling N.S. at the school. In another Last Minute Information to the Court filed on October 24, 2013, DCFS changed its

4

recommendation from a non-detained petition to a detained petition, citing to parents failure to attend the detention hearing the prior day.

At the October 24, 2013 hearing, both Mother and Father appeared. The juvenile court found a prima facie case for detaining the children had been shown and ordered temporary placement and custody with DCFS and ordered separate, monitored visits for parents at DCFS's office, and a protective custody warrant for the children. A jurisdictional hearing was set for December 6, 2013.

In a November 25, 2013 Jurisdiction/Disposition Report, DCFS reported that a DCFS dependency investigator interviewed Mother who stated the following: There was a lot of confusion regarding the orders in the prior case and Mother was not informed that she could not monitor Father's visits. As to the October 7, 2013 incident, where Mother, N.S. and A.S. were found at Father's Manhattan Place home by DCFS and police, Mother had driven to Father's from her home with MGM in Lancaster to visit and had been in Father's home for only 30 minutes when the social worker and police arrived. As to Father's contact with A.S. and N.S. during the August 21, 2013 incident between Father and Brianna, Father's contact was monitored by Alexis (paternal aunt) but Mother did not know why Alexis was not mentioned in the police reports about the incident or why she did not intervene on A.S.'s behalf. Mother was not in a romantic relationship with Father. There was no ongoing domestic violence between the couple and no incidents of domestic violence since 2008. Mother did not complete the programs during the prior case but did participate in many sessions and had participated in case plan activities for an estimated four and a half months. Mother did not contact the Los Angeles Elementary School to re-enroll N.S. and intended to enroll N.S. in a Lancaster school.[5]

According to the Jurisdiction/Disposition Report, Brianna received a text from Father stating Mother, N.S. and A.S. would be living with him because they were being

[5] Father was not interviewed for the Jurisdiction/Disposition Report.

5

evicted. Brianna also stated Father was alone with N.S. and A.S. during the August 21, 2013 incident and on many other occasions before that day.

The Jurisdiction/Disposition Report noted that Father's conduct included providing a false address and being uncooperative, refusing to provide a correct address when confronted, refusing to take Bryson to a police station when requested by law enforcement responding to Brianna's report, lying to the DCFS social worker when he answered the door of the Manhattan Place apartment and said it was the wrong address, living with Mother as evidenced by a police report listing Mother's address to be the same as Father's, and the long history of domestic violence which Father had not addressed in counseling.

An Addendum Report filed on December 6, 2013, reported a telephone interview by a DCFS dependency investigator with Father during which Father questioned a number of statements from the Jurisdiction/Disposition Report and the conduct of the DCFS social worker. Father also stated the following: Mother and Brianna were "vindictive women" who were supposed to admit their lies to DCFS. The prior 2011 case was based on lies and DCFS failed to conduct a proper investigation. He lived at two locations in Los Angeles—the Manhattan Place address with his sister, paternal aunt Alexis, and the Figueroa Street address. Because of a roommate at the Figueroa Street location, Father could not provide the apartment number nor meet the DCFS social worker inside that apartment. In terms of N.S.'s enrollment at Los Angeles Elementary, that school was more convenient for Mother's schedule and commute than the Lancaster one. As to the October 7, 2013 incident, where Mother, N.S. and A.S. were found at Father's Manhattan Place home by DCFS and police, Mother arrived early in the morning because they had plans. Alexis was with him most times he was with the children. As to Father's contact with A.S. and N.S. during the August 21, 2013 incident involving Father and Brianna, Alexis had accompanied Father to meet Brianna, but was in the restroom when Brianna took A.S. from his car after he refused to let her take Bryson with her.

Mother and Father were present at the initial jurisdiction hearing on December 6, 2013. Because several witnesses would be called, the juvenile court scheduled a contested jurisdiction hearing for January 31, 2014.

In a January 31, 2014 Last Minute Information for the Court, DCFS reported that a dependency investigator spoke with N.S., who stated the following: Prior to her detention, she lived with Mother in MGM's house in Lancaster and Father lived in Los Angeles. Mother would drive N.A. and A.S. to Father's house and they would all spend the night and Mother would leave them with Father when she ran errands. N.S. attended a school in Los Angeles called the Los Angeles Elementary School. When asked if she attended school in Lancaster, N.S. said she did, but gave the name as the Los Angeles Elementary School. Alexis was not with them during the August 21, 2013 incident between Father and Brianna, nor was Alexis with them during another visit when N.S. spent time with Father and Brianna. Father and Mother did not fight or yell at each other.

In a Supplemental Report dated January 31, 2014, Mother reported attending individual counseling, but Father did not report enrollment in any programs.

Mother and Father were present in court on January 31, 2014. DCFS agreed to dismiss all counts except an amended count b-1. Because it was late in the day, the juvenile court continued the contested jurisdictional hearing to February 27, 2014, and ordered Mother and Father, as well as Alexis, to return.

At the February 27, 2014 jurisdiction hearing, neither Mother nor Father were present.[6] Father's counsel requested the juvenile court admit into evidence a mediation agreement in the 2011 prior case that contained the agreed upon sustained allegation. The juvenile court also admitted into evidence seven DCFS exhibits, consisting of various reports and Last Minute Information for the Court forms and attachments.

---

[6] Counsel for Mother and counsel for Father requested a continuance to contact their respective clients to ascertain their respective whereabouts, but the court denied the motion noting that parents were ordered back at the prior hearing and the court also had proofs of service of notice of the proceedings.

Mother's counsel asked the juvenile court to amend the count to conform to proof by striking the allegation that Mother was prohibited from acting as monitor as the family law order in the 2011 prior case did not prohibit Mother from acting as Father's monitor for visits, unlike other orders in that case. Mother's counsel argued that there was no evidence that Mother and children lived with Father as N.S.'s school enrollment did not establish that they were living together. Mother's counsel, however, conceded N.S.'s statements "impeach my client's credibility because they show that . . . Mother probably was leaving the child unmonitored with Father, which would have been a violation of the order." Mother's counsel also argued that there was no evidence that the children were placed at risk because there was no evidence that Father engaged in any violence with Mother.

In addition to joining Mother's counsel's arguments, Father's counsel noted the social worker had no concerns about the parents' conduct, described Father's visits as appropriate, and there was no evidence of any violence or risk of harm to the children. Although Father's counsel conceded that Father did not complete his programs in the prior 2011 case, he asserted Father did not violate any orders while the prior case was open.

After argument, the juvenile court sustained count b-1 after striking the words "mother not to be monitor" and dismissed the remaining counts. The court found by a preponderance of the evidence that N.S. and A.S. were children described by section 300, subdivision (b). The court then continued the disposition hearing to March 27, 2014.[7]

The disposition hearing was continued to May 29, 2014. On May 29, 2014, DCFS filed a Last Minute Information for the Court, asking the juvenile court to allow parents' monitored visits to occur at any DCFS-approved location, rather than to be monitored at a

---

[7] In response to Father's counsel's question confirming that the court was continuing the hearing for contested disposition, the juvenile court responded, "Yeah. Called a second bite at the apple."

8

DCFS office as directed by the court in its October 24, 2013 order.[8] The last minute information noted parents had been on time, appropriate and engaged at their visits.

At the May 29, 2014 hearing, the juvenile court ordered parents' visits to occur at a DCFS-approved location, not at the DCFS office, with a DCFS-approved monitor, and granted DCFS the discretion to further liberalize the visits. The court then continued the hearing until June 20, 2014.

At the June 20, 2014 hearing, the juvenile court admitted into evidence DCFS's May 29, 2014 last minute information to the court. Father's counsel called Mother to testify and she stated the following: Mother understood Father wanted N.S. and A.S. released to both parents and for termination of the case. She had no concerns about Father's parenting. In the prior case, Mother lied, making false claims of domestic violence when in fact there had never been any domestic violence between them. Mother lied because her sister did not like Father and did not want Father around the apartment Mother and her sister shared, but Mother in fact did not have any problems with Father when she made the accusations. Mother attended approximately five co-parenting classes without Father during January and February 2014.[9] Starting in February 2014, Mother occasionally attended a group therapy session for parenting and domestic violence and had attended about eight sessions, the last one being three weeks earlier. Mother lived with MGM in Lancaster and did not know where Father was living. Since the current case opened, Mother did not have contact with Father except by telephone.

Father testified that he agreed with Mother's testimony and also stated the following: Father wanted the juvenile court to dismiss the case and release the children to him. Since the prior case ordered monitored visits, Mother had apologized to him and

---

[8] The request was apparently prompted by DCFS's concern that the existing order hindered Mother's consistent visitation because all DCFS offices closed on the weekends, which conflicted with Mother's work schedule, and prevented parents from participating in the children's therapy sessions as they did not take place at a DCFS office.

[9] Under cross-examination she conceded that she had not received a certificate of completion but also stated that it was "just some random co-parenting classes I just decided to go to on my own."

9

they were prepared to share custody. He and Mother had been co-parenting without conflict prior to DCFS's involvement in the current case. Father's contact with children was monitored by paternal aunt. Father attended seven parenting classes as part of the prior case but did not complete the program because he could not afford to pay for the classes, though he found the classes to be helpful. Father believed he did not need any more classes or counseling. If the court ordered counseling, however, he would comply to get his children back. Father also took a parenting class through family law court when he filed for joint custody before any dependency proceedings had occurred. Father also stated that he attended 23 individual counseling sessions that addressed the prior case as well as other issues. Father had not attended any co-parenting classes.

Father denied any physical conflict with Mother and did not believe it would be appropriate to ever use physical force against Mother.

After argument, the juvenile court took the matter under submission and continued the matter to June 24, 2014, four days later. On June 24, 2014, the juvenile court noted that the sustained allegation was that the parents violated the family law order in the prior case, but concluded that "Mother's violation of the court orders really in essence didn't give a risk, any defined risk of harm; so by the standard by which the court has to find today by clear and convincing evidence, the court in applying that standard would have to release the children to the care and custody of the mother." The court ordered the children released to Mother.

The juvenile court concluded, however, "father is differently situated. The exit order indicates he is to have monitored visits. That's the exit order; however, I am going to change Father's visits. Because the evidence that the court has read through, his visits with his children seem to be very good and – but the court is not going to change the custody arrangement. It will remain in the Mother's care and custody, and then we will go through exactly what the Father will need to do in order to change the custody arrangement." The juvenile court then stated that it would "continue jurisdiction in this case until this court is confident that the parents will abide by the court orders that the court is going to institute" and declared the children to be dependents of the juvenile

10

court and ordered the children to remain removed from Father's physical custody. Father was ordered to complete domestic violence and parenting programs and to submit to a mental health assessment. The court ordered unmonitored visits in a public setting for Father until DCFS could assess his home. Mother was ordered not to allow Father into her home, but they could visit together in a public setting.

After staying its orders until the next day to allow DCFS to assess Mother's new home, on June 25, 2014, the court lifted the stay on its orders and amended Father's case plan to allow him to address domestic violence in individual counseling.

## DISCUSSION

On appeal, Father contends that the jurisdictional finding based on amended count b-1 was not supported by substantial evidence, because DCFS failed to prove that -- at the time of the February 27, 2014, jurisdiction hearing -- N.S. or A.S. had suffered or were at current risk of suffering any serious physical harm or that Mother or Father failed or was unable to adequately supervise or protect them. Father does not dispute that parents did not comply with the family law order in the prior case restricting Father's contact with children. He argues parent's conduct had not created any defined risk of harm because there was no evidence of physical harm to the children or domestic violence between parents, relying on the juvenile court's statements at disposition and the lack of "significant change in the family's situation" during the four months between the jurisdictional finding and the disposition.

"The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) At the jurisdiction hearing, "[p]roof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a).)

"In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to

11

support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

Under section 300, subdivision (b), jurisdiction is appropriate where the court finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse." "[T]hree elements must exist for a jurisdictional finding under section 300, subdivision (b): '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.] 'The third element "effectively requires a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]"''" (*In re J.O.* (2009) 178 Cal.App.4th 139, 152.)

Here, at the time of the February 27, 2014 hearing, substantial evidence supported the juvenile court's jurisdictional finding. Neither Mother nor Father attended or testified at the jurisdictional hearing. Thus, at the jurisdictional hearing, the evidence before the juvenile court consisted of the various DCFS reports and their attachments and a mediation agreement introduced by Father's counsel detailing the agreed upon sustained finding in the prior case -- the parents had a "history of domestic altercations including an incident on 8-02-11 in which the parents struggled over ownership of a truck. Such domestic confrontations between the father and mother place the children's physical and emotional health and safety at substantial risk of harm." Although the December 6, 2013 Addendum Report reported Father's claim that Mother had lied in the prior DCFS case,

12

Mother did not testify nor admit that she had lied until the disposition hearing four months after the jurisdictional finding. In the prior case, although Father was ordered to complete a parenting program and complete a domestic violence class or address domestic violence in individual counseling, at the February 27, 2014 hearing, there was no evidence Father had completed a domestic violence or parenting class or any documentation of attendance or progress in individual therapy to address domestic violence. Thus, at the time of the February 27, 2014 jurisdictional finding, the evidence showed a 2011 prior case with a sustained allegation of a history of domestic altercations which placed the children at substantial risk, Father's visits were unmonitored (and possibly residing with the children and Mother) in contravention of the family law order in the prior case, and Father failed to complete any of the ordered programs. Drawing all reasonable inferences from the evidence supporting the jurisdictional finding, substantial evidence supported the finding that N.S. and A.S. were persons described by section 300.

Contrary to Father's contention, the juvenile court's determination at disposition to allow Father unmonitored visits in public settings with children does not undermine the jurisdictional finding. Preliminarily, the standard of proof required at disposition of clear and convincing evidence is greater than the standard of preponderance of the evidence required at the jurisdictional hearing. Moreover, much of the evidence favorable to Father at the disposition hearing was not presented at the jurisdictional hearing. For instance, the evidence of Father's appropriate DCFS-monitored visits with children which the juvenile court cited at disposition was not filed until May 29, 2014, or three months after the jurisdictional finding.[10] Notably, even with the evidence presented in Father's favor at the disposition hearing, the juvenile court nonetheless decided to "continue jurisdiction in this case until this court is confident that the parents will abide by the court orders." Thus, although the juvenile court altered Father's visitation to unmonitored based on the positive evidence for Father, it declined to alter custody, and

---

[10] As already mentioned, Mother's testimony that she lied about the domestic violence underlying the 2011 prior case likewise was not presented at the jurisdictional hearing.

13

declared the children dependents of the juvenile court and found by clear and convincing evidence that there is "a substantial danger or would be if these children returned home to the physical custody of father" and ordered them removed from Father's physical custody.

## DISPOSITION

We affirm the February 27, 2014 jurisdictional finding.
NOT TO BE PUBLISHED.


CHANEY, Acting P. J.


We concur:


JOHNSON, J.


BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14